## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DANA SNYDER,                          )
                                      )
                Plaintiff,            )
                                      )
v.                                    )        Case No. 10-CV-767-PJC
                                      )
MICHAEL J. ASTRUE, Commissioner of the )
Social Security Administration,       )
                                      )
                Defendant.            )

## OPINION AND ORDER

Claimant, Dana Snyder ("Snyder"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her application for disability insurance benefits under the Social

Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the

parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this

order will be directly to the Tenth Circuit Court of Appeals.  Snyder appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that Snyder was not disabled.  For the reasons discussed below, the Court

**REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Snyder was 43 years old at the time of the hearing before the ALJ on November 16, 2009.

(R. 29, 35).  Snyder was a high school graduate.  (R. 36).  Snyder testified that she last worked in

2004 working in a warehouse.  (R. 37).

Snyder testified that she had been on short term disability leave with her employer following back surgery, and after she had returned to work, she had been terminated. (R. 41). She testified that after her return, she had been placed in a different position, and she had experienced major depression. *Id.* She had not been able to return to her previous position due to a 35-pound weight restriction. (R. 41-42).

Snyder testified that her symptoms had worsened since her back surgery. (R. 42). She could only sit for about 10 minutes before she would need to move around. (R. 42, 54-55). She could sit for about 15 minutes before she would have to stand up. (R. 55). She estimated that she could stand for about 15-30 minutes before she would have to sit down or lie down. (R. 42, 55). She wasn't sure how much walking she could do. (R. 42, 55-56). As an example, she could walk when grocery shopping, but she leaned on the shopping cart for support. (R. 42-43). She could walk at the grocery store for 15-20 minutes, but after walking for that long she hurt so bad that she would need to sit down. (R. 56). It was difficult for her to hold her 20-pound grandson for very long. *Id.* She could probably lift 10-15 pounds for about one-third of an 8-hour work day. *Id.*

In the summer of 2009, Snyder had experienced blackouts due to the combination of medications she had taken. (R. 43). Due to these episodes, when she had custody of her daughter, her mother or older daughter were with her. (R. 43-44).

Snyder had previously had breast reduction surgery in an attempt to alleviate neck and shoulder issues. (R. 44). Approximately ten years earlier, Snyder had carpal tunnel surgery on her left hand. *Id.* Her surgeon had indicated that if she returned to work she would have increased symptoms. (R. 44-45). Snyder testified that, at the time of the hearing, she had numbness in her hands, and she dropped items such as pencils and utensils. (R. 45). When she

started her car, she sometimes experienced a sensation in her right hand that she described as a pinching sensation or shock.  *Id.*  She could not do fine manipulations with her hands.  *Id.*

When she had her daughter, she would take her to school accompanied by her mother or older daughter.  *Id.*  When she returned home from that trip, she would get back in bed.  *Id.*  She had trouble sleeping, and she estimated that she slept six hours at night.  (R. 45-46).

Snyder testified that she could do light laundry, and she could unload the dishwasher.  (R. 46).  She did her own shopping and driving.  (R. 54, 56).  She hired someone to take care of her small yard.  *Id.*  Snyder didn't do any cooking, and they had a family dinner at her mother's house every night.  (R. 43-44, 53).  She spent her day watching television, lying in bed, or moving to the couch.  (R. 53).  Her mother came over and did housework for her, including vacuuming.  (R. 53-54).  Snyder would clean up a mess if she made one.  (R. 53).  Snyder testified that she used to read a lot, but she didn't read at the time of the hearing.  (R. 54).  She sometimes went to a movie with family members, and when she did, they would sit in the back, where she could prop up her legs, stand, or move around, if she needed to.  (R. 46).

Snyder testified that she had sharp pain coming from her right leg Achilles tendon up to her thigh.  (R. 47).  She did not have as much pain on her left side.  *Id.*

Snyder had seen a physician named Calvin White for pain management.  *Id.*  Dr. White performed some steroid injections, but was not able to continue due to scarring around Snyder's lumbar spine.  *Id.*  Dr. Wright had continued to be able to give Snyder injections in her lower back.  (R. 48).  Snyder rated her low back pain as 9 on a scale of 1 to 10.  *Id.*

Snyder testified that due to her depression and her medications she had difficulty remembering details, she had headaches, and she had difficulty concentrating.  (R. 49-50).  To remember her medications, she had them lined up in her bathroom.  (R. 49).

Snyder had recently had another MRI of her lower back, and Dr. Hawkins believed that some of her hardware was "symptomatic" but he did not recommend surgery.  (R. 50).

Snyder had also recently been to Dr. Wright because she was experiencing discomfort in her rib cage and belly button area.  (R. 51).  She was going to have a CT scan or MRI for that, and she was wearing a girdle-type garment due to this condition.  *Id.*

Snyder sometimes had numbness of her right foot, and the foot would drag.  *Id.*  She testified that she had fallen several times, including going up or down stairs.  *Id.*

Michael B. Clendenin, M.D. wrote a letter, apparently to a workers' compensation insurer, regarding an initial office evaluation on November 24, 1992 and a follow-up visit on December 22, 1992.  (R. 196-97).  The letter said that Snyder presented with pain and numbness in both hands.  (R. 196).  Snyder's symptoms had begun about one year earlier and had progressed.  *Id.*  She had tried an anti-inflammatory medication that had not given much benefit. *Id.*  Tinel's signs on both arms were equivocal.  Phalen's signs caused wrist pain and finger paresthesias.  *Id.*  There was no weakness in either hand.  *Id.*  Dr. Clendenin's conclusion was that Snyder had bilateral carpal tunnel syndrome.  *Id.*  He gave an injection to the left arm, which he said was more symptomatic.  *Id.*  He gave Snyder wrist braces and a prescription for Voltaren. *Id.*  At the December follow-up appointment, Dr. Clendenin stated that Snyder did not want surgery, and that her symptoms had improved with splinting, steroid injections, and job modifications.  (R. 197).  He said that he was "afraid that [Snyder's symptoms] will worsen when she returns to her former job activities."  *Id.*

Dr. Clendenin wrote another letter to a workers' compensation insurance carrier regarding office visits in April, May, and July 1995.  (R. 198-200).  As a result of continued pain symptoms, Snyder had surgery on July 13, 1995 on her left side, including "open left carpal

tunnel release," "release of the ulnar nerve at the wrist in Guyon's canal," and a "carpectomy of the pisiform."  (R. 199).

Snyder saw R. Jeff Wright, D.O. to establish care on January 30, 2003.  (R. 441-42).  Dr. Wright's diagnoses were that Snyder had temporomandibular joint disorder ("TMJ"), myofascitis in the cervical-thoracic spine areas, and sleep disorder.  (R. 441).  He made a number of recommendations and prescribed medication.  *Id.*

Records show that an MRI of Snyder's lumbar spine was conducted on April 9, 2003 due to right L5/S1 radiculopathy.  (R. 277).  The radiologist's impressions were L5/S1 disk protrusion or extrusion with thecal sac and nerve impingement likely, with mild facet joint effusions.  *Id.*

On June 13, 2003, Snyder apparently saw the certified physician assistant in Dr. Wright's office with "problems [with] low back, legs."  (R. 438).  The hand-written notes of the examination, diagnosis, and plan are not legible.  *Id.*  It appears that Snyder saw the physician assistant for follow up on June 17, 2003, and at that time, Snyder also complained of depression, and was prescribed Effexor.  (R. 437).

Don L. Hawkins, M.D., of Central States Orthopedics, conducted an office evaluation on August 7, 2003.  (R. 281-83).  Snyder related to Dr. Hawkins that she had noticed numbness and tingling into her right foot in February 2003, and then the MRI was done in April 2003.  (R. 281).  She apparently then hurt herself at work after July 2003 and was referred for physical therapy.  *Id.*  Dr. Hawkins stated that, at the time of his evaluation, Snyder was working with a 20-pound restriction.  *Id.*  At the time of Dr. Hawkins' evaluation, Snyder complained of pain across her low back slightly greater to the left.  *Id.*  She still had numbness and tingling down her right leg into her foot, and she had gradually developed some numbness and tingling on the left side.  *Id.*

5

After examining Snyder and reviewing the x-rays and MRI, Dr. Hawkins' diagnoses were central disc herniation L5/S1, interspace narrowing and stenosis L5/S1, and lumbar radiculitis.  (R. 282). He recommended that she continue working with a 20-pound restriction, that she try epidural steroid injections at L5/S1, and that she continue taking Vioxx.  (R. 283).  An injection was done on August 19, 2003.  (R. 284-85).

Dr. Hawkins saw Snyder on September 19, 2003, and she reported that she was working in a new position with her employer that did not require any heavy work.  (R. 286).  Sometimes prolonged walking caused discomfort in her legs.  *Id.*  The steroid injection helped, but her leg pain had returned, and it was worse than her back pain.  *Id.*  Dr. Hawkins adjusted Snyder's medications and recommended another injection, which was done on October 6, 2003.  (R. 286-87).

Snyder saw Dr. Wright on October 30, 2003 for refills, and she informed him of her treatment by Dr. Hawkins.  (R. 436).  Dr. Wright's diagnoses included depression and sleep disorder.  *Id.*  Snyder had a third steroid injection for the L5/S1 issue on December 2, 2003.  (R. 288).  She saw Dr. Wright again on December 3, 2003 for follow up, and diagnoses included depression, chronic low back pain, and sleep disorder.  (R. 435).

Dr. Hawkins saw Snyder again on December 16, 2003, and he noted that she was "still having severe pain and numbness."  (R. 289-90).  On examination, straight leg raising produced pain, and Snyder had decreased ankle jerk asymmetrically on the right.  (R. 289).  His diagnoses were large central herniation L5/S1 with bilateral S1 radicular symptoms, stenosis L5/S1, and instability L5/S1.  *Id.*  Dr. Hawkins recommended laminectomy and fusion at L5/S1.  (R. 289-90).  Dr. Hawkins performed the surgery on December 22, 2003.  (R. 291-93).

At a postoperative office visit on January 13, 2004, Dr. Hawkins said that Snyder was "doing very well" and "feeling better," although he found some pain, tightness, and tingling.  (R. 294).  He noted that Snyder was very depressed, he prescribed Elavil for the depression, and he adjusted her other medications.  *Id.*  He recommended that she return to work with a 5-pound restriction and a gradual work schedule from 4 hours each day, then 6 hours, and then 8 hours after three weeks.  *Id.*

There is a record that imaging done on February 19, 2004, of Snyder's right leg due to her symptom of pain in her right foot, but the imaging showed no evidence of deep venous thrombosis.  (R. 295).

On March 2, 2004, Dr. Hawkins saw Snyder and said that she was "doing very well."  (R. 297).  He noted that Snyder had "some degree of radicular symptoms in the right leg which are improving now."  *Id.*  He recommended that she continue to work with the 5-pound restriction. *Id.*

Snyder saw the physician assistant in Dr. Wright's office on March 29, 2004 to discuss medications and her complaint of "not sleeping much."  (R. 434).  The physician assistant appears to have noted that Snyder was tearful.  *Id.*  He diagnosed depression and sleep disorder, but it is difficult to read any of the remaining hand-written notes.  *Id.*

On April 15, 2004, Dr. Hawkins saw Snyder and stated that she was doing "extremely well," had "excellent relief of her symptoms," and had a little discomfort only occasionally. (R. 299).  He stated that his physical examination was unremarkable.  *Id.*  He said that he recommended a 30-pound restriction on a permanent basis and that Snyder said that she could "do her normal job with that, without any problems at all."  *Id.*  He stated that Snyder had reached maximum medical improvement and was released from care.  *Id.*  Dr. Hawkins also

completed a form, releasing Snyder to return to work with a permanent restriction of no lifting or carrying over 30 pounds.  (R. 298).

Snyder again saw the physician assistant at Dr. Wright's office on April 19, 2004 to discuss her medications, and he appears to have adjusted her medications related to sleep disorder.  (R. 433).

Records show that Snyder presented to Laureate Psychiatric Clinic and Hospital ("Laureate") on May 12, 2004.  (R. 202-14).  The reason for the assessment on this date was given as a worsening of depression that Snyder said that she had experienced for at least 10 years.  (R. 204).  Snyder reported passive suicidal thoughts with no intent, and she reported that several years earlier she had "turned the gas on in her garage in a suicide attempt."  *Id.*  The assessment included a finding that her social isolation was moderate and that her work/school impairment was mild, with Snyder reporting that "her performance at work has declined."  (R. 205).  Snyder's Axis I[1] diagnosis was depressive disorder not otherwise specified, and her global assessment of functioning ("GAF")[2] was assessed as currently 40, with a highest GAF in the past year of 55.  (R. 206).  She was discharged to an intensive outpatient program.  (R. 207).

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[2]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*.  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

Snyder saw Dr. Wright on May 28, 2004 with complaints of depressed mood, passive suicidal ideas, and lack of sleep for three weeks. (R. 432). He appears to have discussed her depression with her in some depth, added Wellbutrin to her medications, and referred Snyder to another physician. *Id.* On June 7, 2004, Snyder complained of jittery feelings and trembling. (R. 431). She had begun counseling. *Id.* Dr. Wright's diagnoses included depression, sleep disorder, and hormonal imbalance, and he adjusted Snyder's medications. *Id.* On July 6, 2004, it appears that Snyder reported to Dr. Wright that she was doing better and was going out more, although she was still tired and not sleeping well. (R. 430). She had stopped going to counseling, but had purchased the books that the counselor had recommended. *Id.* She had trapezius muscle tension. *Id.* Dr. Wright adjusted her medications. *Id.* An appointment later that month again shows that Snyder was feeling better, and there was a reference to Snyder returning to work in August. (R. 429). On August 4, 2004, Dr. Wright diagnosed myofascial shoulder pain, and he discussed breast reduction surgery with Snyder and apparently made a referral. (R. 428).

On August 5, 2004, a registered physical therapist completed a permanent partial impairment rating that was limited only to the range of motion of Snyder's lumbar spine and that concluded that she had a 7% whole-person impairment rating. (R. 216-18).

Snyder saw Dr. Hawkins on December 7, 2004 for increasing pain and problems with her shoulders and neck. (R. 303). Dr. Hawkins thought Snyder had some shoulder strain, and he deferred to other physicians for an opinion regarding whether breast reduction surgery would help Snyder's symptoms. *Id.* He noted that Snyder had some mild discomfort in her low back region, and she had gained some weight. *Id.* He recommended weight reduction and swimming as a form of exercise. *Id.* Dr. Hawkins prescribed Naprosyn. *Id.*

On May 3, 2005, Snyder had breast reduction surgery.  (R. 325-27).

In August 2005, Snyder saw Dr. Wright with a chief complaint of low back pain.  (R. 423).  She apparently saw him with the same complaint in September 2005.  (R. 422).

Snyder saw someone in Dr. Wright's office on February 3, 2006 to refill her medications.  (R. 420).  Diagnoses were insomnia, chronic lower back pain, muscle cramping, and sinusitis.  *Id.*  On March 9, 2006, Snyder reported to Dr. Wright that she continued to have pain in her back and legs.  (R. 418).  Diagnoses included lower back pain and situational stress with secondary depression.  *Id.*

On October 6, 2006, Snyder saw a new physician assistant in Dr. Wright's office regarding her history of back pain and current constant pain in her legs, neck, and back.  (R. 416).  The physician assistant diagnosed chronic back pain and prescribed several pain medications.  *Id.*

Snyder saw Dr. Wright on November 17, 2006 for pain in her neck, shoulder, and legs.  (R. 412).  Dr. Wright made several diagnoses, and he referred Snyder for a repeat MRI of her lower back.  *Id.*

On November 22, 2006, an MRI was done of Snyder's lumbar spine, which showed at the L5/S1 level "asymmetric edematous enlargement of the exiting right L5 nerve root" that could reflect neuritis.  (R. 414-15).  At the L4/L5 level, there was a very mild disk bulge.  *Id.*

On December 8, 2006, Snyder returned to Dr. Wright for a follow-up appointment.  (R. 411).  On January 22, 2007, Snyder complained of shaking and "skin crawling."  (R. 409).  Dr. Wright's hand-written notes are not clear, but it appears that he adjusted Snyder's medications.  *Id.*

On April 10, 2007, Snyder saw Archibald S. Miller, III, M.D., with Cosmetic & Reconstructive Surgery of Tulsa, to discuss a tummy tuck, her breast scars, and possible breast

implants.  (R. 344, 364).  On May 7, 2007, Snyder had an "abdominal panniculectomy" (tummy

tuck) and other procedures.  (R. 348-50).

An electrodiagnostic test conducted on September 19, 2007 showed an abnormal study

that was consistent with "mild chronic right L5 radiculopathy."  (R. 473-74).

On December 31, 2007, Snyder saw Dr. Wright and asked for an injection in her joints.

(R. 401).  Dr. Wright's notes are not clear, but it appears that he performed injections into

Snyder's right sacroiliac joint and her right trochanter.  *Id.*

Snyder saw Dr. Wright for a follow-up appointment on January 31, 2008.  (R. 400).  On

May 12, 2008, Snyder came in for "disability forms."  (R. 530).  Dr. Wright indicated that he

completed a form, and his diagnoses that day included chronic back pain, lumbar disk disease,

and depression.  *Id.*  On July 11, 2008, Snyder saw the physician assistant in Dr. Wright's office,

who diagnosed her with back pain, abdominal pain, history of laminectomy of the lumbar spine,

and ventral hernia.  (R. 529).  On July 25, 2008, Snyder was diagnosed with multiple kidney

stones, and she refused surgery at that time.  (R. 528).

Snyder saw Dr. Hawkins on September 2, 2008 for evaluation of her low back pain and

radiating hip and leg pain.  (R. 540-41).  After examination, his diagnosis was recurrent bilateral

lumbar radiculitis.  *Id.*  He recommended an MRI.  (R. 541).  An MRI done the next day showed

a mild annular bulge of the L4/L5 intervertebral disc with a small central protrusion and mild

central canal stenosis.  (R. 538).  Dr. Hawkins reviewed the results of the MRI with Snyder on

September 23, 2008, and gave diagnoses of "[r]etained symptomatic spinal implants L5-S1," and

"[d]isc protrusion centrally L4-5."  (R. 546).  He recommended an epidural steroid injection, but

Snyder stated that she had already tried to have one, and the physician was unable to perform it

due to scarring.  *Id.*  He recommended medical management and no further surgery at that point.

*Id.*

Snyder saw Stephanie Forbes, D.O., with Psychiatric Associates of Tulsa, on June 9, 2009 for medication assessment.  (R. 556-57).  After reviewing Snyder's history, Dr. Forbes noted that Snyder's affect was blunted and that she was tearful.  (R. 557).  Dr. Forbes assessed her judgment and insight as good.  *Id.*  There was a note that Snyder had a history "of taking more medication than prescribed."  *Id.*  Dr. Forbes diagnosed Snyder with depression and with panic disorder with agoraphobia, and she adjusted all of the medications that Snyder had been taking for those conditions.  *Id.*  On July 16, 2009, Snyder was very tearful, and she was disheveled.  (R. 554).  From Dr. Forbes' notes, it appears that Snyder stated that she had difficulty leaving the house and difficulty falling asleep.  *Id.*  Dr. Forbes changed Snyder's medications and referred her for counseling.  *Id.*  On September 9, and October 21, 2009, Snyder's complaints continued, and Dr. Forbes adjusted her medications.  (R. 551-52).

Dr. Wright completed a Mental Status Form on May 12, 2008.  (R. 492).  On the form, Dr. Wright stated that Snyder was well oriented, but did not handle stress well.  *Id.*  He said that she took care of her daughter and did light (underlining the word "light") housework and cooking.  *Id.*  He said that she was unable to vacuum, clean floors, or move furniture.  *Id.*  He said that her prognosis for recovery for depression was fair, but that it would be dependent on the degree of back pain Snyder experienced.  *Id.*  He indicated that Snyder could remember, comprehend, and carry out simple instructions on an independent basis.  *Id.*  He said that excessive work pressure would aggravate Snyder's depression.  *Id.*  His diagnosis was chronic depression.  *Id.*

Agency consultant Seth Nodine, M.D. completed a consultative examination of Snyder on June 10, 2008.  (R. 493-500).  On examination, he found that Snyder had normal strength, and

her gait was "normal and steady."  (R. 495).  Snyder had slightly limited range of motion in her

back and experienced pain with that limited range of motion.  (R. 496, 498).  She had tenderness

along her scar from her previous lumbar spine surgery and into her right buttock.  (R. 495, 498).

Dr. Nodine's assessments were chronic lumbar back pain with right leg radiculopathy, major

depressive disorder, anxiety, and insomnia.  (R. 495).

Nonexamining agency consultant Carmen Bird, M.D., completed a Physical Residual

Functional Capacity Assessment form on June 20, 2008.  (R. 519-26).  Dr. Bird found that

Snyder had the exertional capacity to perform light work.  (R. 520).  For narrative explanation,

Dr. Bird reviewed Snyder's complaints, her December 2003 lumbar fusion, and the September

2007 EMG study.  (R. 520).  She also summarized Dr. Nodine's report from his consultative

examination, and Snyder's activities of daily living.  *Id.*  Dr. Bird found that Snyder could only

occasionally stoop, but could frequently climb, balance, kneel, crouch, and crawl.  (R. 521).  She

found no other established limitations.  (R. 522-26).

Agency nonexamining consultant Burnard Pearce, Ph.D., completed a Psychiatric Review

Technique form dated June 20, 2008.  (R. 501-14).  For Listing 12.04, Dr. Pearce noted Snyder's

symptoms of depressive syndrome.  (R. 504).  For the "Paragraph B Criteria,"[3] Dr. Pearce found

that Snyder had mild restriction of activities of daily living, moderate difficulties in maintaining

social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with

---

[3]There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment. The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

no episodes of decompensation.  (R. 511).  In the "Consultant's Notes" portion of the form, Dr.

Pearce briefly summarized the form completed by Dr. Wright and a statement in Dr. Nodine's

report that Snyder's mental condition would not be limiting except for her back pain.  (R. 513).

On the Mental Residual Functional Capacity Assessment, Dr. Pearce found that Snyder

was moderately limited in her ability to understand, remember, and carry out detailed

instructions.  (R. 515).  He also found that Snyder was moderately limited in her ability to

interact appropriately with the general public. (R. 516).  Dr. Pearce said that Snyder could

perform simple and some complex tasks, could relate to others on a superficial work basis, and

could adapt to a work situation.  (R. 517).

### Procedural History

Snyder filed an application on April 21, 2008 seeking disability insurance benefits under

Title II, 42 U.S.C. §§ 401 *et seq*.  (R. 117-19).  Snyder alleged onset of disability as May 27,

2004.  (R. 117).  The application was denied initially and on reconsideration.  (R. 73-77, 79-81).

A hearing before ALJ Charles Headrick was held November 16, 2009 in Tulsa, Oklahoma.  (R.

29-65).  By decision dated January 28, 2010, the ALJ found that Snyder was not disabled.  (R. 9-

20).  On October 1, 2010, the Appeals Council denied review of the ALJ's findings.  (R. 1-4).

Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this

appeal.  20 C.F.R. § 404.981.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court

"may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Snyder met insured status through December 31, 2009.  (R. 11).  At

Step One, the ALJ found that Snyder had not engaged in any substantial gainful activity during

the period from her alleged onset date of May 27, 2004 through her date last insured.  *Id.*  At Step

Two, the ALJ found that Snyder had severe impairments of "major depressive disorder and back

pain, status post lumbar fusion."  *Id.*  At Step Three, the ALJ found that Snyder's impairments

did not meet a Listing.  (R. 11-12).

The ALJ determined that Snyder had the RFC to perform light work with only occasional

stooping and additional limitations to simple and complex tasks and relating to others on a

superficial work basis.  (R. 12).  The ALJ specified that Snyder was able to adapt to a work

situation.  *Id.*  At Step Four, the ALJ found that Snyder was able to perform past relevant work as

an assembler.  (R. 18).  At Step Five, as an alternative finding, the ALJ found that there were

jobs that Snyder could perform, taking into account her age, education, work experience, and

RFC.  (R. 19).  Therefore, the ALJ found that Snyder was not disabled at any time from May 27,

2004 through December 31, 2009.  (R. 20).

## Review

Snyder makes three arguments that the ALJ's decision should be reversed.  First, she

argues that the ALJ erred by failing to include her carpal tunnel syndrome as a severe

impairment.  Second, she argues that the ALJ's RFC determination failed to include all of her

limitations.  Third, Snyder faults the ALJ's credibility assessment.  The Court finds that the

ALJ's decision must be reversed because it did not give sufficient reasons for finding Snyder less than fully credible.  Because reversal is required due to errors in the ALJ's credibility assessment, the other issues raised by Snyder are not addressed.

Credibility determinations by the trier of fact are given great deference.  *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

Snyder's attack on the ALJ's credibility assessment is that the ALJ gave only boilerplate reasons for finding her less than fully credible and that his assessment therefore did not meet the requirement of specific reasons linked to substantial evidence.  The undersigned agrees that the ALJ's credibility assessment is legally inadequate because it consists, with one exception, of "boilerplate" provisions that are predetermined language identical to language used in numerous other decisions.[5]  The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).  The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and

---

[5]*See Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012) in which Judge Posner explains that the Commissioner's brief described language as a "template," meaning a "passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains."  The *Bjornson* opinion also favorably quotes the Tenth Circuit case of *Hardman*, discussed in the text, on the troubling nature of boilerplate language.

how those facts led him to his decision.  *Id.*  Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered."  *Id.*

Here, after the ALJ's summary of Snyder's testimony and some of the medical records, the ALJ then gave an entire page of boilerplate provisions in lieu of any actual analysis of Snyder's credibility.[6]  The only exception is that the ALJ lists several activities of Snyder when

_____

[6]The following is verbatim from the ALJ's decision.  (R. 17).

The claimant's statements about her impairments and their impact on her ability to perform activities of daily living and basic functions are not entirely credible in light of discrepancies between the claimant's alleged symptoms, and objective documentation in the file.  Although the claimant has described daily activities which are fairly limited, two factors weigh against these allegations to be strong evidence in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Second, even if the claimant's activities of daily living were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other forms discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  At one point or another in the record, either in forms completed in connection with the application and appeal, medical records or reports, or in the claimant's testimony, the claimant has reported the following activities of taking care of her own personal needs, taking care of her daughter, watches television, light cleaning in her home with duties of chores of dishes and laundry.  The claimant drives and visits with family on a daily basis.

With regard to medication side effects, although the claimant has alleged various side effects from the use of the medications, the medical records, such as office treatment notes, do not corroborate those allegations.

The claimant alleges that she is disabled and unable to work; however, there are numerous inconsistencies regarding the claimant's physical limitations and the objective medical evidence.  Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

finding that her activities of daily living were not as limited as one would expect in someone

totally disabled.  (R. 17).  The undersigned finds that a credibility assessment that consists solely

of a statement of claimant's activities of daily living is not sufficient.  *Hamlin*, 365 F.3d at 1220-

21 (ALJ may not rely on minimal activities of daily living as substantial evidence that a claimant

does not have disabling pain); *Hamby v. Astrue*, 260 Fed. Appx. 108, 112-13 (10th Cir. 2008)

(unpublished) (ALJ "failed to articulate his reasoning with sufficient specificity"); *Sitsler v.*

*Astrue*, 410 Fed. Appx. 112, 116-17 (10th Cir. 2011) (unpublished) (ALJ's credibility assessment

was flawed when it relied on mischaracterization of claimant's activities of daily living and did

not consider uncontroverted evidence of prescription pain medications).

  While it is self-evident that the language used by the ALJ in that portion of his decision

that addresses credibility, as quoted verbatim in footnote 6, was impermissible boilerplate, it is

easy to give examples.  The first sentence states that Snyder's statements were not entirely

credible "in light of discrepancies between the claimant's alleged symptoms, and objective

documentation in the file."  (R. 24).  This sentence fits precisely within *Hardman*'s rejection of

boilerplate language because it fails "to link or connect any of the factors [the ALJ] recited to any

evidence in the record."  *Hardman*, 362 F.3d at 679.  This reviewer cannot know what

"discrepancies" the ALJ identified, nor what "alleged symptoms" and "objective documentation"

were considered as part of those discrepancies.

---

The undersigned finds that, in consideration of all medical evidence, there appears
to be some inconsistency regarding functional limitations and allegations, yielding
to a partial allegation credibility assumption.

In the same paragraph, the ALJ discussed Snyder's activities of daily living:

First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Second, even if the claimant's activities of daily living were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other forms discussed in this decision.

(R. 17).  Language substantially identical to this has been criticized and rejected by the Tenth Circuit.  *Swanson v. Barnhart*, 190 Fed. Appx. 655, 657-58 (10th Cir. 2006) (unpublished); *but see Wall v. Astrue*, 561 F.3d 1048, 1069-70 (10th Cir. 2009) (language was "common sense observation" by ALJ rather than imposition of objective verifiability as standard).  In *Swanson*, the Tenth Circuit found this language troubling for several reasons, including that the court was "at a loss as to what the ALJ meant by 'other reasons' and 'other factors.'"  *Id.*  The court said that "the ALJ's lack of specificity precludes effective review."  *Id.*

The undersigned agrees with the Tenth Circuit's criticism in *Swanson*,[7] and the criticism applies to all of the passages that the ALJ included in his decision in place of an actual analysis of Snyder's credibility.  When the ALJ's entire credibility discussion is made up of boilerplate or "template" passages, there is nothing for the Court to review.  Judge Posner recently stated that "[t]he Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'"  *Bjornson*, 671 F.3d at 646.  The undersigned shares this concern and asks the Commissioner to review the inappropriate use by ALJs of predetermined language in place of actual analysis.

---

[7]The undersigned previously discussed this language in a 2010 decision available on Westlaw, and made the following plea to the Commissioner:  "The Commissioner should ensure that this language is not used in future ALJ credibility determinations."  *Watashe v. Astrue*, 2010 WL 3022913 (N.D. Okla.).  *Watashe* was reported several months after the ALJ had written his decision here.

The undersigned acknowledges the line of Tenth Circuit cases holding that the inclusion of inapplicable or improper language in the decision does not mean that the ALJ's credibility analysis is fatally flawed.  In *White*, the court reiterated that it "condemned" the practice of merely giving a boilerplate recitation of the law and stated that it insisted "that an ALJ give specific reasons why he or she rejects a claimant's subjective complaint of pain."  *White*, 287 F.3d at 909.  However, the court went on to affirm because it found that the ALJ's credibility assessment "did not rest on mere boilerplate language, but instead was linked to specific findings of fact."  *Id.* at 910.  *See also Freeman v. Astrue*, 441 Fed. Appx. 571, 574 (10th Cir. 2011) (unpublished) (boilerplate statement would not have been adequate if that had been the extent of the ALJ's credibility analysis); *Arles v. Astrue*, 438 Fed. Appx. 735, 738-39 (10th Cir. 2011) (unpublished) (boilerplate is disfavored, but it is only insufficient in the absence of a more thorough analysis); *Qualls v. Astrue*, 428 Fed. Appx. 841, 847-48 (10th Cir. 2011) (unpublished) ("despite the ALJ's use of disfavored language, his ultimate credibility determination is grounded in a thorough analysis").  Here the ALJ's use of boilerplate language would not have required reversal if the ALJ had then gone on to perform an actual assessment of Snyder's credibility, linking substantial evidence to specific reasons.  *Hardman*, 362 F.3d at 678-81.

While there may have been sufficient reasons with supporting evidence that could justify an adverse credibility determination, the undersigned finds that the Court cannot make that determination without impermissibly substituting its judgment for that of the ALJ.  *Peeper v. Astrue*, 418 Fed. Appx. 760, 766 (10th Cir. 2011) (unpublished), *citing Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004).  On remand, the ALJ should make a thorough analysis of Snyder's subjective complaints, including a discussion of the factors listed in 20 C.F.R. § 404.1529(c).  *Sitsler*, 410 Fed. Appx. at 117; *Hamby*, 260 Fed. Appx. at 113.

Because the errors of the ALJ related to the credibility assessment require reversal, the undersigned does not address the remaining contentions of Snyder.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Snyder.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 6th day of July, 2012.

Paul J. Cleary
United States Magistrate Judge